UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | |
|---|---|
| TOKIO MARINE SPECIALTY INSURANCE COMPANY,<br><br>    *Plaintiff*<br><br>vs.<br><br>STARCHEM, LLC,<br><br>    *Defendant*. | CIVIL ACTION NO. |

## COMPLAINT FOR DECLARATORY JUDGMENT

The Plaintiff, Tokio Marine Specialty Insurance Company ("Tokio Marine"), by and through its undersigned counsel, brings this action seeking a declaratory judgment pursuant to 28 U.S.C Section 1332 and 2201, against StarChem. LLC ("StarChem") to resolve an actual controversy as to the rights, duties, and obligations of the parties under a certain primary liability insurance policy issued by Tokio Marine to StarChem.  In support of its Complaint, Tokio Marine alleges as follows:

### NATURE OF THE ACTION

1.      StarChem along with various other defendants has been named as a defendant in an action filed by the Woodruff-Roebuck Water District ("Woodruff") on or about July 8, 2024, and served upon StarChem on July 29, 2024, in the Seventh Judicial Circuit in Spartanburg, South Carolina, *Woodruff-Roebuck Water District v. AFL Telecommunications LLC, et al*., C.A. No. 2024-CP-42-02480, alleging discharges of PFAS components by the defendants into certain rivers in South Carolina (the "Action").

2.      Tokio Marine issued a primary policy number PPK1591543 (the "Policy") to StarChem for the policy period December 31, 2016 to December 31, 2026.

3.      In a letter dated August 13, 2024, through its counsel, Star Chem contended that it is entitled to a defense and indemnity under the Policy with respect to the allegation set forth in the Action.

4.      In a letter dated December 16, 2024, from Tokio Marine's counsel to Star Chem's counsel, Tokio Marine contended that there is no coverage under the Policy for the Action for several reasons, including, without limitation, the application of certain exclusions found in the Policies and the absence of any coverage under the Policy's terms and conditions.

5.      Tokio Marine now brings this action seeking declaratory relief regarding the rights and obligations of the parties under the Policy.

### PARTIES

6.      Plaintiff Tokio Marine is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at One Bala Plaza, Suite 100, Bala Cynwyd, Pennsylvania.

7.      Defendant StarChem is a Georgia limited liability company authorized to do business in South Carolina, with its principal place of business in Spartanburg County at 10150 Greenville Highway, Wellford, South Carolina.

### JURISDICTION AND VENUE

4.      Tokio Marine brings this insurance coverage action pursuant to Federal Rule of Civil Procedure 57 and the Declaratory Judgment Act, 28 U.S.C. § 2201(a), and for the purpose of determining the rights and indemnification obligations, if any, of Tokio Marine under the Policy with respect to StarChem's request for coverage for StarChem's potential liability in the Action.

5.      For jurisdictional purposes, Plaintiff is a citizen of both Delaware and Pennsylvania, while Defendant is a citizen of Georgia and South Carolina.

6.      This Court has jurisdiction of this civil action pursuant to 28 U.S.C. §1332(a)(1), in that the Defendant seeks indemnity damages in excess of $75,000.00 under the Policy, and this action is between citizens of different states.

7.      Venue is proper in this district pursuant to 28 U.S.C. 1391(a)(1) and (a)(2), in that the acts and claim activity occurred, and the locations of the allegedly damaged real property giving rise to this suit are all situated within the United States District Court for South Carolina.

8.      This matter is ripe for adjudication as there is an actual and justiciable controversy between the parties as to the amounts owed, if any, under the Policy.

## FACTUAL ALLEGATIONS

### A.    The Policy

9.      Tokio Marine issued to StarChem the Policy, which is a Commercial Lines Policy, includes without limitation, a "Premises Environmental Coverage Policy Form," PIC-EVP-002 (11/09), with a "Remediation Expense and Liability: Remediation of On-Site Contamination" limit of $7 million "per contamination incident," a "Remediation Expense and Liability: Remediation of Off-Site Contamination" limit of $7 million "per contamination incident," a "Bodily Injury and Property Damage Resulting from Contamination" limit of $7 million "per contamination incident," and an "Image Restoration" limit of $7 million "per contamination incident." *See* Policy, attached as Exhibit A.

10.     The Policy also has a self-insured retention of $100,000 "per contamination incident" subject to an aggregate retention of $200,000 for all contamination incidents; once the aggregate retention is satisfied, the Policy has a $50,000 "per contamination incident retention, in the form

of an "Aggregate Deductible" Endorsement, PIC-EVPN-008 (11/09); and a "Self-Insured Retention" Endorsement, PIC-EVPN-054 (11/09).

11.    Under the Self-Insured Retention endorsement, "a single Retention amount shall apply to all claims, loss or remediation expense arising from the same or related discharge, dispersal, release or escape of any contaminants."

12.    In the Policy, the "Retrospective Date" is shown on the Declarations page to be "December 31, 2021.

13.    In pertinent part, the insurance provisions of the Primary Policy under the "Premises Environmental Coverage Policy Form," are as follows, as modified by the "Deletion of Discovery Trigger" Endorsement, PIC-EVPN-020 (11/09):

**"PREMISES ENVIRONMENTAL COVERAGE INSURANCE**

**I.    INSURING AGREEMENTS**

**A.    Remediation Expense and Liability**

1.    Remediation of On-Site Contamination

We will pay for remediation expense resulting from contamination on or under your insured location that the insured becomes legally obligated to pay as a result of a claim for remediation expense that is first made against the insured and reported to us during the policy period, or within the extended reporting period.

2.    Remediation of Off-Site Contamination

We will pay for remediation expense resulting from contamination migrating from and beyond the boundaries of your insured location that the insured become legally obligated to pay as a result of a claim for remediation expense that is first made against the insured and reported to us during the policy period, or within the extended reporting period.

**B.    Bodily Injury and Property Damage Resulting from Contamination**

4

We will pay for loss that the insured becomes legally obligated to pay as a result of a claim for bodily injury or property damage arising out of contamination on, under or migrating from your insured location, provided such claim is first made against the insured and reported to us during the policy period, or within the extended reporting period.

### C.    Image Restoration

We will pay for covered expenses incurred for image restoration arising out of damage to your reputation or consumer confidence as a result of contamination reported to us during the policy period or the extended reporting period and that result in bodily injury, property damage or remediation expense covered under this policy. Covered expenses are limited to the costs of restoring your reputation and consumer confidence through image consulting.

14.    The Policy's "Premises Environmental Coverage Policy Form, Section II, Definitions, includes the following definitions

A.    **Additional insured** means any individual, organization or entity scheduled to this policy as an additional insured by an endorsement, but solely for their liability arising out of their ownership, use, operation nor financing of your insured location.

\*        \*        \*

C.    **Claim** means a written demand, notice, or assertion of a legal right seeking a remedy or alleging liability or responsibility on the part of you or any insured as a result of contamination. Such demand, notice, or assertion of a legal right includes, but is not limited to legal actions, orders, petitions or governmental or regulatory actions, filed against you or any insured.

D.    **Contaminant** means any solid, liquid, gaseous or thermal irritant or pollutant, including but not limited to smoke, vapor, odors, soot, fumes, acids, alkalis, toxic chemicals, hazardous substances, petroleum hydrocarbons, legionella, electromagnetic fields, low level radiological matter and waste materials including but not limited to municipal, industrial, medical, pathological, and low level radioactive waste materials.

E.    **Contamination** means:

1. The discharge, dispersal, release or escape of any contaminants into or upon land, or any structure on land, the atmosphere or any watercourse

5

or body of water, including groundwater, provided such conditions are not naturally present in the environment in the amounts or concentrations discovered.

2. The presence of contaminants that have been illegally disposed of or abandoned at your insured location by parties other than an insured provided such presence, disposal or abandonment tare unknown to the insured.

\*      \*      \*

G.     **Defense Expense** means cost, charges and expenses incurred in the defense, investigation or adjustment of any claim.

H.     **Emergency expenses** means reasonable and necessary expenses incurred to contain, control or mitigate contamination that is an imminent and substantial endangerment to:

1. The public health, safety or welfare where in the absence of such action to contain, control or mitigate contamination, bodily injury or property damage to third parties is imminent; or

2. The environment;

and pursuant to laws that require such immediate response to contamination.

I.     **Environmental professional** means a person or entity chosen by us, in consultation with the insured, that possesses appropriate expertise, licensing, certification and qualifications to address the contamination.

\*      \*      \*

L.     **Insured** means:

1. The named insured and any subsidiary thereof; and

2. Any past or present director, officer, partner or employee of the insured, including a temporary or leased employee, while acting within the scope of his or her employment as such; and

3. Additional insured.

M.     **Law** means any federal, state, provincial or local statutes, rules, regulations, ordinances, guidance documents, voluntary clean up or risk based corrective action programs and judicial or administrative orders and

directives and all amendments thereto that apply or may be applied to the insured's responsibility for contamination.

N.    **Loss** means:

1. Monetary awards or settlements, previously agreed in writing to by us, of compensatory damages and, where allowable by law, punitive, exemplary, or multiplied damages, civil fines, penalties and assessments for bodily injury or property damage ;and

2. Related defense expense.

\*        \*        \*

S.    **Property damage** means:

1. Physical injury to or destruction of tangible property of parties other than the **insured** including the resulting loss of use and diminution in value thereof;

2. Loss of use, and diminution in value of tangible property of parties other than the **insured** that has not been physically injured or destroyed; and

3. **Natural resource damage.**

However, **property damage** shall not include **remediation expense**.

T.    **Remediation expense** means:

1. Reasonable and necessary expenses, including legal expenses, incurred for investigation, removal, abatement, disposal, treatment, clean-up or neutralization, including associated monitoring, of **contaminants**;

   a. To the extent required by **law** or, in the absence of applicable **law**, to the extent recommended by an **environmental professional**; or

   b. That have been actually incurred by any government department or agency;

2. Monetary awards or settlements, previously agreed to in writing by us, of compensatory damages that the **insured** is legally obligated to pay for investigation, removal, abatement, disposal, treatment, clean-up or neutralization, including associated monitoring, of **contaminants**; and

7

3. Related **defense expense**; including **restoration expense** and **emergency expenses**.

14. The Policy's "Premises Environmental Coverage Policy Form, Section IV, Exclusions, includes the following exclusions:

**IV. EXCLUSIONS**
This insurance does not apply to claims, losses, remediation expense or any other coverage afforded under this policy:

\*          \*          \*

**C.**     **Contractual Liability** - Based upon or arising out of liability of others assumed by the **insured** under any contract or agreement, unless the **insured** would have been liable in the absence of such contractor agreement. This exclusion does not apply to any contract submitted to and approved by us and listed in an Insured Contract Schedule that is made a part of this policy by endorsement but only as respects to coverage provided in the insuring agreements or other coverage afforded under this policy,

**D.**     **Criminal Fines and Penalties** - Based upon or arising out of any criminal fines, penalties or assessments.

**E.**     **Damage to Insured's Property** - Based upon or arising out of physical injury to or destruction of tangible property, including the resulting loss of use and diminution in value, to any property owned, leased, rented by an **insured** or loaned to an **insured**. This exclusion applies solely with respect to **claims** for **property damage**

\*          \*          \*

**M.**     **Non-Disclosed Known Contamination -** Based upon or arising out of **contamination** in existence prior to the **inception date** or the effective date of an endorsement to this policy which is:

1. Known by or has been reported to any **responsible individual**; and

2. Not disclosed to us in the application for this policy or any other supplemental information provided in connection with the application for this policy, an endorsement, or any previous policy issued by us for which this policy is a renewal thereof.

8

**Contamination** expressly disclosed to us and not otherwise excluded under this policy or by endorsement shall be deemed by us to have been first **discovered** on the **inception date** or the effective date of the applicable endorsement.

    \*        \*        \*

**Q.**     **Retrospective Date** - Based upon or arising out of **contamination** that first began on or after the **Retrospective Date** shown in ITEM **9.b.** of the Declarations of this policy. This exclusion does not apply if "not applicable" is shown in ITEM **9.b** of the Declarations."

15.     The Policy also contains an endorsement, entitled the "Blanket and Scheduled Non-Owned Location Coverage" ("Non-Owned Location Endorsement"), which adds an additional coverage part to the Policy as follows:

"**Section I.  Insuring Agreements** is amended to include the following:

**Non-Owned Locations - Bodily Injury, Property Damage and Remediation Expense**

We will pay for **loss** or **remediation expense** that the **insured** becomes legally obligated to pay as a result of a **claim** for **bodily injury**, **property damage** or **remediation expense** arising out of **contamination** on, under or migrating from a **non-owned location** or **scheduled non-owned location**, provided such **claim** is first made against the **insured** and reported to us in writing during the **policy period**, or within the **extended reporting period**."

16.     The Non-Owned Location Endorsement also amends Section II. "Definitions" of the Policy to include the following new definition:

"**Non-owned location** means a facility used for the recycling, treatment, storage or disposal of the **insured's** waste or materials generated at **your insured location**, but only if at the time the facility accepts the **insured's** waste, the facility:

    a.   is not owned, managed, operated or leased by the insured or a parent, subsidiary or affiliate of the insured;

    b.   is permitted and/or licensed under the applicable regulations or **laws** to accept and process such materials or waste;

    c   is not subject to any action under CERCLA or a similar or equivalent federal, state, local or provincial statute, regulation or ordinance;

    d.   has not ever been listed on the Federal National Priorities List or state or provincial equivalent (State Superfund or Hazardous Site List); and

e.   is not insolvent or in bankruptcy."

17.    The Non-Owned Location Endorsement amends as well Section IV. "Exclusions" of the

Policy to include the following new exclusion:

> **"Non-Owned Location Retroactive Date** - Based upon or arising out of
> **contamination** at or migrating from a **non-owned location,** including any
> subsequent dispersal, movement or migration of such **contaminants,** that first began
> prior to the Non-Owned Location Retroactive Date shown in this endorsement. This
> exclusion does not apply to a **non-owned location** if "not applicable" is shown as the
> corresponding Non-Owned Location Retroactive Date.
>
> Non-Owned Location Retroactive Date: December 31, 2016"

**B.    The Action**

18.    In the Complaint in the Action, the plaintiff, the Woodruff-Roebuck Water District

("Woodruff") states that it is bringing the Action to address the Defendants' alleged ongoing

contamination of the North Tyger River, Middle Tyger River, South Tyger River, and Plaintiff's

property with certain toxic per- and polyfluoroalkyl substances ("PFAS"):  perfluorooctanoic

acid ("PFOA"); perfluorooctanesulfonic acid ("PFOS"); perfluorononanoic acid" ("PFNA");

perfluorobutane    sulfonate    ("PFBS");    perfluorohexane    sulfonate    ("PFHxS");    and

hexafluoropropylene oxide dimer acid ("HFPO-DA" or "GenX Chemicals").  *See* Complaint at

para. 1.  The Complaint in the Action is attached hereto as Exhibit B.

19.    Woodruff alleges that "Defendants have discharged and continue to discharge products

that contain or degrade to these PFAS to the North, Middle, and South Tyger Rivers, which

travel downstream to Plaintiff's water intakes on the North and South Tyger Rivers and

contaminate both Plaintiff's property and the domestic water supply for nearly 12,000 water

customers in Spartanburg County."  Woodruff seeks a declaratory judgment, injunctive relief,

abatement, damages, and an award of costs, including attorneys' fees, for Defendants' repeated

and ongoing PFAS contamination."  *See* Complaint at para. 2.

10

20.    Woodruff claims to be a "special purpose district that provides potable water to residents of Spartanburg County."  It also alleges that it is the "owner and occupant of riparian land on, and near the confluence of, the North and South Tyger Rivers," where it "owns and operates the Woodruff-Roebuck Water District Water Treatment Plant (a surface water treatment plant, or 'SWTP') and related buildings, improvements, and equipment that make up its water distribution system.  Plaintiff operates separate water intakes on each river, from which it draws raw water for treatment in the SWTP before distribution of treated water to customers."  *See* Complaint at para. 3.

21.    Woodruff also alleges that the defendants in the Action (the "Defendants") own and/or operate "industrial facilities upstream of Plaintiff's water intakes and have in the past and/or currently use products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in their industrial processes."  Woodruff claims that the Defendants "discharge these products to surface waters via certain wastewater treatment plants ('WWTPs') located upstream of Plaintiff's water intakes.  *See* Complaint at para. 17.

22.    These WWTPs include the Lower North Tyger River WWTP in Spartanburg, South Carolina; the Lyman WWTP in Lyman, South Carolina; and the Maple Creek WWTP in Greer, South Carolina."  See Complaint at para. 4.  Woodruff further alleges that one of the Defendants is StarChem, which allegedly "operates an industrial facility where it uses products that contain or degrade to PFOA, PFOS, PFINS, PFNA, PFBS, and/or GenX Chemicals in manufacturing products related to the textile industry."  *See* Complaint at para. 17.

23.    Woodruff alleges that the Defendants' PFAS contaminates Woodruff's water sources at concentrations well exceeding what the U.S. Environmental Protection Agency ("EPA") deems unsafe for consumption.  Woodruff further alleges that its existing water treatment processes

cannot remove the PFAS components, and that instead, it requires new water filtration technologies to remove, and provide water free from, the Defendants' PFAS. *See* Complaint at paras. 5 - 6.

24.     Woodruff specifically alleges that as a result of the Defendants' alleged "intentional, willful, wanton, reckless, and/or negligent acts and omissions and the nuisance thereby created, maintained, and continued, [Woodruff] has suffered injury to its property rights and resulting damages, including compensatory and consequential damages." *See* Complaint at para. 7.

25.     Woodruff's causes of action in the Action include a private action of nuisance, a public action of nuisance, a claim of trespass and a claim of negligence against StarChem and the other defendants.   Woodruff is seeking equitable and injunctive relief requiring the Defendants to cease discharging PFAS into the North, Middle, and South Tyger Rivers; and requiring Defendants to fund the acquisition, installation, and operation of water treatment technologies at Woodruff's SWTP that will remove the Defendants' PFAS from drinking water.   In addition, based on the Defendants' alleged "intentional, willful, wanton, reckless, malicious, and oppressive misconduct," Woodruff is seeking the recovery of punitive damages. *See* Complaint at para. 7.

26.     Woodruff alleges that the Defendants are owners and operators of manufacturing plants, related industrial facilities, and/or waste disposal services in or near Spartanburg County.   In their industrial processes, the Defendants allegedly utilize products that contain or degrade to PFOS, PFOA, PFHxS, PFNA, PFBS, and/or GenX Chemicals.   Woodruff also alleges that the Defendants' industrial processes generate industrial wastewater containing these PFAS chemicals and/or their precursors, which they discharge to either the Maple Creek WWTP, the Lyman WWTP, or the Lower North Tyger WWTP. *See* Complaint at para. 46.

27.     Woodruff alleges that the Maple Creek WWTP utilizes conventional wastewater treatment methods to treat industrial wastewater, which are unable to remove PFAS. After treatment, the Maple Creek WWTP discharges water contaminated with Defendants' products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals into Maple Creek upstream of the South Tyger River.  These PFAS and their precursors allegedly flow downstream to Plaintiff's water intake on the South Tyger River, damaging Plaintiff's property and contaminating its water source.  *See* Complaint at para. 47.

28.     Woodruff also alleges that the Lyman WWTP utilizes conventional wastewater treatment methods to treat industrial wastewater, which are unable to remove PFAS. After treatment, the Lyman WWTP discharges water contaminated with Defendants' products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals into the Middle Tyger River upstream of its confluence with the North Tyger River.  These PFAS and their precursors flow downstream to Plaintiff's water intake on the North Tyger River, damaging Plaintiffs property and contaminating its water source.  *See* Complaint at para. 48.

29.     Woodruff further alleges that the Lower North Tyger WWTP utilizes conventional wastewater treatment methods to treat industrial wastewater, which are unable to remove PFAS. After treatment, the Lower North Tyger WWTP allegedly discharges water contaminated with Defendants' products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals into the North Tyger River.  These PFAS and their precursors are alleged to flow downstream to Plaintiff's water intake on the North Tyger River, damaging Woodruff's property and contaminating its water source.  *See* Complaint at para. 49.

30.     Woodruff alleges that all the Defendants knew or should have known that the Maple Creek WWTP, Lyman WWTP, and Lower North Tyger WWTP utilize conventional treatment

methods for industrial wastewater that cannot remove Defendants' PFAS. Woodruff also alleges that all of the Defendants also know or should have known that the WWTPs discharge treated effluent contaminated with their PFAS chemicals to the rivers, contaminating the water that Woodruff draws for its customers. *See* Complaint at para. 50.

31.    Woodruff alleges that the Defendants, including StarChem, "have for decades discharged PFOA, PFOS, PFHxS, PFNA, PFBS, GenX Chemicals, and their precursors into the North, Middle, and South Tyger Rivers, which has caused, and continues to cause, contamination of these waters with PFAS chemicals exceeding EPA's health advisories, MCLGs, and MCLs." Woodruff also alleges that absent new treatment technologies, it cannot provide water that is either free of all PFOA and PFOS, or compliant with EPA's MCLs. *See* Complaint at para. 51.

32.    Woodruff further alleges that Defendants' conduct has "proximately caused the contamination of the South, Middle, and North Tyger Rivers; and of Plaintiff's land, its SWTP, and its water distribution system with PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals, including PFOA and PFOS at concentrations well above EPA's MCLGs and MCLs." *See* Complaint at paras. 52 – 53.

33.    Woodruff also maintains that the Defendants, including StarChem, "have knowingly, intentionally, recklessly, and/or negligently engaged in conduct or omissions that proximately caused unreasonable interference with Plaintiff's right to use and enjoy its property, its right to use the rivers, and has caused Plaintiff additional past, present, and future injury to property." *See* Complaint at paras. 52 – 53.

**C.    StarChem's Coverage Demand and Tokio Marine's Response**

34.     Star Chem has sought defense and indemnity under the Policy from Tokio Marine with respect to the allegations set forth in the Action.  *See* Letter from StarChem's Counsel, dated August 13, 2024 ("August 13, 2024, Letter), attached hereto at Exhibit C.

35.     StarChem claims that under the Policy, Tokio Marine was obligated to "pay the amount of loss, remediation expense or other coverage afforded under this [P]olicy in excess of the applicable [SIR] and up to the applicable Limit of Insurance."  *See* August 13, 2024, Letter, at 1.

36.      StarChem also claims that the Policy provides "coverage for contamination that migrates from and beyond the insured location, and affords three general areas of coverage to StarChem: (1) Remediation Expenses and Liability; (2) Bodily Injury and Property Damage Resulting from Contamination and (3) Image Restoration."  *See* August 13, 2024, Letter, at 2.

37.     StarChem further claims that "the Remediation Expense and Liability (as modified by Endorsement PIC-EVPN-020) covers remediation expenses for both on-site and off-site contamination that StarChem 'becomes legally obligated to pay as a result of a claim for remediation expense that is first made against [StarChem] and reported to [Tokio Marine] during the policy period, or within the extended reporting period.'"  *See* August 13, 2024, Letter, at 2.

38.     In addition, StarChem claims that the "Bodily Injury and Property Damage coverage applies to losses that StarChem becomes 'legally obligated to pay as a result of a claim for bodily injury or property damage arising out of contamination on, under or migrating from [the Site] . .'. While 'Property Damage' does include damage to natural resources, it does not include Remediation Expenses as defined in the Policy."  *See* August 13, 2024, Letter, at 2.

39.     StarChem also claims that the "Image Restoration coverage applies to 'covered expenses incurred for image restoration arising out of damage to [StarChem's] reputation or consumer

confidence as a result of contamination . . . and that result from bodily injury, property damage or remediation expense' covered under the Policy." *See* August 13, 2024, Letter, at 2.

40.     StarChem further claims that in the Complaint, "Woodruff-Roebuck Water District, a downstream owner and occupant on and near the North and South Tyger Rivers, alleges that StarChem discharges from the insured location industrial wastewater contaminated with products that contain or degrade to PFAS to the Lyman Wastewater Treatment Plant ('Lyman WWTP')," and that the "Lyman WWTP, in turn, allegedly cannot remove the PFAS, resulting in discharges of StarChem's PFAS into the Middle and North Tyger Rivers, which ultimately contaminate Woodruff-Roebuck Water District's property and water sources." *See* August 13, 2024, Letter at 3.

41.     StarChem claims that the cost of defending StarChem in the Action "is a covered defense expense pursuant to its Policy, as PFAS is recognized by EPA as a contaminant," and that "StarChem does not believe this alleged contamination falls under any of the exclusions for claims, losses and remediation expenses identified in Section IV of the Policy." *See* August 13, 2024, Letter at 3.

42.     In the December 16, 2024, letter ("December 16, 2024, Letter") from Tokio Marine's counsel responding to the August 13, 2024, to counsel for Star Chem, Tokio Marine stated that the facts alleged in the Complaint in the Action against StarChem failed to bring any claim within the Policy's coverage, and as such, Tokio Marine had no duty to defend or indemnify StarChem with respect to the allegations set forth in the Complaint. *See* December 16, 2024, Letter, at 14 - 20, attached hereto as Exhibit D.

43.     Tokio Marine further stated there was no coverage under the Policy because the exclusions contained in the Policy precluded coverage for allegations in the Complaint in the Action against StarChem.  *See* December 16, 2024, Letter, at 14 - 20.

## FIRST CAUSE OF ACTION
### Declaratory Relief – No Covered Property Damage

44.     Tokio Marine incorporates and re-alleges Paragraphs 1 through 43 above as though fully set forth herein.

45.     There is no coverage under the Policy because in the Complaint in the Action, Woodruff does *not* allege that:  (1) there has been any contamination "on or under [StarChem's] insured location; (2) there has been any contamination "migrating from and beyond the boundaries of [StarChem's] insured location;" and (3) there has been any property damage that has arisen "out of contamination on, under or migrating from [StarChem's] insured location."  To the contrary, the allegations in the Complaint make clear that the only discharges of PFAS components into the two rivers at issue are those that emanated from the treatment plants themselves.

46.     Tokio Marine contends that the allegations in the Action do not fall with the insuring agreement of the Policy to the extent that they do not allege covered property damage.

47.     Tokio Marine has complied with all of its obligations and duties under the Policy.

48.     An actual controversy exists between Tokio Marine and StarChem relating to their respective rights and obligations under the Policy.

49.     A declaratory judgment is necessary to determine the rights and obligations of the parties under the Policy as to this issue.

## SECOND CAUSE OF ACTION
### Declaratory Relief – No Trigger of Coverage for On-Site Contamination

50.     Tokio Marine incorporates and re-alleges Paragraphs 1 through 49 above as though fully set forth herein.

51.     With respect to the remediation of "On-Site Contamination," the Policy provides coverage for "remediation expense resulting from contamination on or under your insured location that the insured becomes legally obligated to pay as a result of a claim for remediation expense."

52.     Here, the Complaint in the Action does not allege that Woodruff's damages from the discharge of PFAS components into the two rivers by the wastewater treatment plants resulted from any alleged "contamination on or under" StarChem's location.

53.     Therefore, Tokio Marine contends that this coverage part of the Policy has not been triggered by any allegation contained in the Complaint in the Action.

54.     Tokio Marine has complied with all of its obligations and duties under the Policy.

55.     An actual controversy exists between Tokio Marine and StarChem relating to their respective rights and obligations under the Policy.

56.     A declaratory judgment is necessary to determine the rights and obligations of the parties under the Policy as to this issue.

**THIRD CAUSE OF ACTION**
**Declaratory Relief – No Trigger of Coverage for Off-Site Contamination**

57.     Tokio Marine incorporates and re-alleges Paragraphs 1 through 56 above as though fully set forth herein.

58.     With respect to the remediation of "Off-Site Contamination," the Policy provides coverage for "remediation expense resulting from contamination migrating from and beyond the boundaries of your insured location that the insured becomes legally obligated to pay as a result of a claim for remediation expense."  Here, the Complaint does not allege that any of Woodruff's

18

damages from the discharge of PFAS components into the two rivers by the wastewater treatment plants resulted from any alleged "migrating from and beyond the boundaries of" StarChem's location.

59.     In addition, the Complaint in the Action does not allege anywhere that any PFAS components were physically "released" at the StarChem location and subsequently "migrated" offsite in the one of the rivers at issue.

60.     Therefore, Tokio Marine contends that this coverage part of the Policy has not been triggered by any allegation contained in the Complaint in the Action.

61.     Tokio Marine has complied with all of its obligations and duties under the Policy.

62.     An actual controversy exists between Tokio Marine and StarChem relating to their respective rights and obligations under the Policy.

63.     A declaratory judgment is necessary to determine the rights and obligations of the parties under the Policy as to this issue.

## FOURTH CAUSE OF ACTION
### Declaratory Relief – No Property Damage Arising out of
### Contamination on, Under or Migrating from the Insured Location

64.     Tokio Marine incorporates and re-alleges Paragraphs 1 through 63 above as though fully set forth herein.

65.     With respect to "Bodily Injury and Property Damage Resulting from Contamination," the Policy provides coverage for "loss that the insured becomes legally obligated to pay as a result of a claim for bodily injury or property damage arising out of contamination on, under or migrating from your insured location."  The Complaint in the Action, however, does not allege that Woodruff's damages from the alleged discharge of PFAS components into the two rivers by the

wastewater treatment plants resulted from any alleged "contamination on or under" StarChem's location.

66.     In addition, the Complaint in the Action does not allege that any of Woodruff's damages from the purported discharge of PFAS components into the two rivers by the wastewater treatment plants resulted from any alleged "migrating from and beyond the boundaries of" StarChem's location.

67.     Tokio Marine contends that this coverage part of the Policy has also *not* been triggered by any allegation contained in the Complaint in the Action.

68.     Tokio Marine has complied with all of its obligations and duties under the Policy.

69.     An actual controversy exists between Tokio Marine and StarChem relating to their respective rights and obligations under the Policy.

70.     A declaratory judgment is necessary to determine the rights and obligations of the parties under the Policy as to this issue.

### FIFTH CAUSE OF ACTION
### Declaratory Relief – No Image Restoration Coverage

71.     Tokio Marine incorporates and re-alleges Paragraphs 1 through 70 above as though fully set forth herein.

72.     StarChem claims that that there is coverage available to StarChem under the Policy's "Image Restoration" coverage part with respect to the allegations contained in Complaint in the Action.  Such coverage is only first party, not third party, and in any event, there are no specific expenses that StarChem has identified for "restoring [StarChem's] reputation and consumer confidence through image consulting."

73.     In addition, the Policy provides coverage where such damage to StarChem's reputation or consumer confidence has occurred "as a result of contamination," and there is no such

"contamination" as defined in the Policy alleged in the Complaint that would be covered under this coverage part.

74.     Tokio Marine contends that this coverage part of the Policy has *not* been triggered by any allegation contained in the Complaint in the Action.

75.     Tokio Marine has complied with all of its obligations and duties under the Policy.

76.     An actual controversy exists between Tokio Marine and StarChem relating to their respective rights and obligations under the Policy.

77.     A declaratory judgment is necessary to determine the rights and obligations of the parties under the Policy as to this issue.

## SIXTH CAUSE OF ACTION
### Declaratory Relief – No Coverage Under Non-Owned Location Endorsement

78.     Tokio Marine incorporates and re-alleges Paragraphs 1 through 77 above as though fully set forth herein.

79.     With respect to the coverage provided under the Non-Owned Location Endorsement, the Policy provides coverage for "loss or remediation expense that the insured becomes legally obligated to pay as a result of a claim for bodily injury, property damage or remediation expense arising out of contamination on, under or migrating from non-owned location."

80.     The wastewater treatment plants at issue in the Complaint in the Action do not come within the definition of "non-owned locations" in the Non-Owned Location Endorsement of the Policy.

81.     Moreover, the Complaint in the Action does not allege that Woodruff's damages from the alleged discharge of PFAS components into the rivers by the wastewater treatment plants, resulted from any alleged "contamination on, under or migrating from" the wastewater treatment plants.

82.     Therefore, Tokio Marine contends that this coverage part of the Policy has not been triggered by any allegations contained in the Complaint in the Action.

83.     Tokio Marine has complied with all of its obligations and duties under the Policy.

84.     An actual controversy exists between Tokio Marine and StarChem relating to their respective rights and obligations under the Policy.

85.     A declaratory judgment is necessary to determine the rights and obligations of the parties under the Policy as to this issue.

## SEVENTH CAUSE OF ACTION
### Declaratory Relief – No Coverage Because of
### Exclusion in Non-Owned Location Endorsement

86.     Tokio Marine incorporates and re-alleges Paragraphs 1 through 85 above as though fully set forth herein.

87.     The Non-Owned Location Endorsement in the Policy also includes the following exclusion that precludes coverage for any property damage or remediation that is "[b]ased upon or arising out of contamination at or migrating from a non-owned location . . . that first began prior to the Non-Owned Location Retroactive Date shown in this endorsement."   In the endorsement, the "Non-Owned Location Retroactive Date" is "December 31, 2016."

88.     In the Complaint in the Action, Woodruff alleges that the Defendants, including StarChem, "have for decades discharged" the PFAS components "into the North, Middle, and South Tyger Rivers, which has caused, and continues to cause, contamination of these waters with PFAS chemicals exceeding EPA's health advisories, MCLGs, and MCLs."  *See* Complaint at para. 51.

89.     The Complaint was filed in 2024, and as such, it alleges that any "discharges" of the PFAS components from the wastewater treatment plants had been going on "for decades."

90.     Therefore, Tokio Marine contends that the exclusion contained in the Non-Owned Location Endorsement would preclude any coverage under that endorsement because the alleged discharges "first began" at least a decade "prior to" the Non-Owned Location Retroactive Date of December 31, 2016.

91.     Tokio Marine has complied with all of its obligations and duties under the Policy.

92.     An actual controversy exists between Tokio Marine and StarChem relating to their respective rights and obligations under the Policy.

93.     A declaratory judgment is necessary to determine the rights and obligations of the parties under the Policy as to this issue.

**EIGHTH CAUSE OF ACTION**
**Declaratory Relief – No Coverage Because of Known Contamination**

94.     Tokio Marine incorporates and re-alleges Paragraphs 1 through 93 above as though fully set forth herein.

95.     Under the Policy, there is an exclusion that provides that there is no coverage for claims, losses, remediation expense or any other coverage "based upon or arising out of contamination in existence prior to the inception date or the effective date of an endorsement to this policy which is . . . [k]nown by or has been reported to any responsible individual; and  . . . [n]ot disclosed to [PIIC] in the application for this policy or any other supplemental information provided in connection with the application for this policy, an endorsement, or any previous policy issued by us for which this policy is a renewal thereof."

96.     To the extent that "contamination" is deemed to include – contrary to the clear definition in the Policy – StarChem's transfer of PFAS components through its wastewater to the Lyman wastewater treatment plant, which thereafter, was treated and discharged into the two rivers, then

any such claims for property damage or remediation expense would nevertheless be excluded from coverage under the Policy.

97.     In the Complaint in the Action, it is alleged that StarChem, along with other Defendants, "have for decades discharged" the PFAS components "into the North, Middle, and South Tyger Rivers, which has caused, and continues to cause, contamination of these waters with PFAS chemicals exceeding EPA's health advisories, MCLGs, and MCLs."

98.     The allegation that StarChem has been "discharging" such PFAS components into the two rivers via the transfer of such components to the Lyman wastewater treatment plant "for decades" demonstrates that Woodruff's allegations in the Action concern alleged "contamination" in existence prior to the inception date" of the Policy on December 31, 2016.

99.     In addition, there is no dispute that StarChem never disclosed to PIIC in applying for the Policy, that it was transferring its wastewater containing PFAS components to the Lyman wastewater treatment facility.

100.    Therefore, Tokio Marine contends that this exclusion would act to preclude any coverage under the Policy with respect to the allegations against StarChem set forth in the Complaint.

101.    Tokio Marine has complied with all of its obligations and duties under the Policy.

102.    An actual controversy exists between Tokio Marine and StarChem relating to their respective rights and obligations under the Policy.

103.    A declaratory judgment is necessary to determine the rights and obligations of the parties under the Policy as to this issue.

**NINTH CAUSE OF ACTION**
**Declaratory Relief – No Coverage for Contamination that**
**Began After the Policy's December 31, 2021, Retrospective Date**

104.    Tokio Marine incorporates and re-alleges Paragraphs 1 through 103 above as though fully set forth herein.

105.    The Policy precludes coverage for any claims, losses, remediation expense or any other coverage "[b]ased upon or arising out of contamination that first began on or after the Retrospective Date shown in ITEM 9.b. of the Declarations" of the Policy.  In the Policy, the "Retrospective Date" is shown on the Declarations page to be "December 31, 2021."

106.    To the extent that "contamination" is deemed to include – contrary to the definition contained in the Policy – StarChem's transfer of PFAS components through its wastewater to the Lyman wastewater treatment plant, which thereafter, was treated and discharged into the two rivers, then any such claims for property damage or remediation expense would nevertheless be excluded from coverage under the Policy where the alleged "contamination" began after December 31, 2021.

107.    In the Complaint in the Action, Woodruff alleges that beginning "[o]n June 15, 2022, EPA again updated health advisory levels" for PFAS components, and that the "EPA explained that updated human epidemiological data indicated 'that the level at which negative health effects could occur are much lower than previously understood when the agency issued its 2016 health advisories for'" certain PFAS components.  *See* Complaint at para. 33.

108.    Woodruff further alleges in the Complaint in the Action, that in "March 2023, EPA issued proposed maximum contaminant level goal" for certain PFAS components, and the EPA announced that "[f]ollowing a systematic review of available human epidemiological and animal toxicity studies, EPA has determined that PFOA and PFOS are likely to cause cancer (e.g., kidney and liver cancer) and that there is no dose below which either chemical is considered safe.'"  *See* Complaint at paras. 35 – 36.

109.    In the Complaint, Woodruff also alleges that on April 10, 2024, the EPA finalized its proposed maximum contaminant level and maximum contaminant goals for certain PFAS components.  See Complaint at para. 39.

110.    Woodruff further alleges that the "EPA's final regulations mandate several new obligations regarding PFAS, including the implementation of solutions to reduce regulated PFAS concentrations in the drinking water that Plaintiff distributes, maintenance of ongoing compliance monitoring, and informing the public of PFAS levels in the water and of any violations.  By 2027, Plaintiff must begin conducting and reporting regular PFAS monitoring, and by 2029, Plaintiff must comply with all MCLs."  *See* Complaint at para. 41.

111.    To the extent that Woodruff's claims for remediation expense and property damage arise of the alleged discharge by the Lyman wastewater treatment plant of certain PFAS components from StarChem's industrial wastewater that first began after the Policy's December 31, 2021, Retrospective Date, then any such claims against StarChem would be precluded from coverage under the Policy.

112.    Therefore, Tokio Marine contends that the Policy's December 31, 2021, Retrospective Date precludes any coverage under the Policy with respect to the allegations against StarChem set forth in the Complaint in the Action.

113.    Tokio Marine has complied with all of its obligations and duties under the Policy.

114.    An actual controversy exists between Tokio Marine and StarChem relating to their respective rights and obligations under the Policy.

115.    A declaratory judgment is necessary to determine the rights and obligations of the parties under the Policy as to this issue.

## TENTH CAUSE OF ACTION
### Declaratory Relief – No Coverage for Current
### Or Future Remedial Measures and Costs

116.     Tokio Marine incorporates and re-alleges Paragraphs 1 through 115 above as though fully set forth herein.

117.     Woodruff in its Complaint in the Action is seeking an Order from the underlying court precluding StarChem and the other Defendants from having PFAS components present in their future transfers of wastewater to the three wastewater treatment plants.

118.     In its Complaint in the Action, Woodruff is also seeking an order compelling StarChem and the other Defendants to fund the acquisition, installation, and operation of new water filtration technology at Plaintiffs SWTP to remove legacy PFOA, PFOS, PFFIxS, PFNA, PFBS, and/or GenX Chemical contamination." *See* Complaint at para. 77.

119.     These measures are directed primarily to those PFAS components that are currently being and in the future will be discharged into the two rivers, all of which will be taking place well after the Policy's December 31, 2021, Retrospective Date.

120.     Therefore, Tokio Marine contends that the Policy's December 31, 2021, Retrospective Date precludes any coverage under the Policy for any current or future measures to preclude PFAS components from being discharged into the two rivers, and there is no coverage under the Policy for these requested future measures and costs.

121.     Tokio Marine has complied with all of its obligations and duties under the Policy.

122.     An actual controversy exists between Tokio Marine and StarChem relating to their respective rights and obligations under the Policy.

123.     A declaratory judgment is necessary to determine the rights and obligations of the parties under the Policy as to this issue.

## REQUEST FOR RELIEF

**WHEREFORE**, Tokio Marine respectfully requests the following relief:

A.      A judicial declaration that there is no coverage under the Policy for the allegations raised in the Action against StarChem due to the application of Policy's terms, conditions, and exclusions of the Policy, as detailed in First through Tenth Causes of Action, above, and that therefore Tokio Marine owes no duty to defend StarChem;

B.      Costs;

C.      Prejudgment interest; and

D.      Such other and further relief in favor of Tokio Marine as the Court deems just and appropriate.

Respectfully Submitted,

**McANGUS GOUDELOCK & COURIE, LLC**

By: *s/ Dominic A. Starr*

_____

Dominic Starr
Federal Bar No. 6025
Zachary S. Brown
Federal Bar No. 12780
2411 North Oak Street, Suite 401
Myrtle Beach, South Carolina 29577-3173
dominic.starr@mgclaw.com
Zachary.brown@mgclaw.com
843-848-6001

Robert Whitney
53 State Street, Suite 1305
Boston, Massachusetts 02109
Robert.whitney@mgclaw.com
617-830-7402

*Attorneys for Plaintiff*

Dated:  December 17, 2025